# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2018 CA 1309

### BOYD LOUISIANA RACING, INC.
### VERSUS
### CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION, STATE OF LOUISIANA

Consolidated With

## 2018 CA 1310

### BOYD GAMING CORPORATION
### VERSUS
### CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION, STATE OF LOUISIANA

Consolidated With

## 2018 CA 1311

### BOYD KENNER, INC.
### VERSUS
### CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION, STATE OF LOUISIANA

**Judgment Rendered:** JAN 0 8 2020

* * * * * *

On Appeal from the Nineteenth Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket No. C539824 c/w C548765 c/w C548766

Honorable Todd W. Hernandez, Judge Presiding

* * * * * *

| | |
|---|---|
| Russell J. Stutes, Jr.<br>Shelley Bouillion<br>J. Michael Veron<br>Lake Charles, Louisiana | Counsel for Defendant/Appellant<br>Cynthia Bridges, Secretary of the Department<br>of Revenue and Taxation, State of Louisiana |
| Linda S. Akchin<br>Jaye A. Calhoun<br>William J. Kolarik, II<br>Baton Rouge, Louisiana | Counsel for Plaintiffs/Appellees<br>Boyd Louisiana Racing Inc., Boyd Gaming<br>Corporation, and Boyd Kenner, Inc. |

* * * * * *

BEFORE: WHIPPLE, C.J., McCLENDON, AND HIGGINBOTHAM, JJ.

Higginbotham, J. concurs in the result.

Whipple, C.J., agrees in part and dissents in part with reasons.

**McCLENDON, J.**

In these consolidated tax cases, the defendant appeals a district court's judgment that granted a partial summary judgment in favor of the plaintiffs. For the following reasons, we affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

Boyd Gaming Corporation (Boyd Gaming) is engaged in the gaming industry, owning and operating through its numerous subsidiaries and affiliate casinos and horse-racing facilities throughout the nation. Boyd Gaming is domiciled in Nevada. Boyd Gaming directly owns two Louisiana subsidiaries, Boyd Kenner, Inc. (Boyd Kenner) and Boyd Louisiana Racing, Inc. (Boyd Louisiana Racing). Boyd Kenner is a partner in Treasure Chest, LLC, a casino in Kenner, Louisiana. Boyd Louisiana Racing owns Boyd's Racing, LLC, which owns and operates Delta Downs, a pari-mutuel racetrack and casino in Vinton, Louisiana.

For the tax years 2002, 2003, and 2004 (the audit period), each of the Boyd entities reported and paid income and franchise taxes as reflected on their returns. Boyd Kenner and Boyd Louisiana Racing filed their state tax returns as Louisiana entities, and Boyd Gaming filed its Louisiana tax returns as a nonresident.

In 2005 and 2006, the State of Louisiana, Department of Revenue and Taxation (the Department) issued a Notice of Proposed Tax Due to each of the plaintiffs, Boyd Gaming, Boyd Louisiana Racing, and Boyd Kenner, following an income and franchise tax audit for the audit period. The audits resulted in an upward adjustment of the taxable capital base for each of the three entities and the assessment of additional corporate franchise taxes, with interest, to their businesses. Originally, Boyd Gaming paid a total of $373,515.00 in franchise taxes, Boyd Louisiana Racing paid a total of $331,371.00 in franchise taxes, and Boyd Kenner paid a total of $116,076.00 in franchise taxes. Following the audits, the plaintiffs were assessed additional taxes and interest, for the tax years 2002, 2003, and 2004, in the following amounts: Boyd Gaming was assessed a total of $1,082,930.63, Boyd Louisiana Racing was assessed a total of $277,033.72, and Boyd Kenner was assessed a total of $244,548.66. The plaintiffs paid to the Department the additional franchise taxes and interest, under

2

protest, and notified the Department that they would be seeking a refund of the amounts paid.

Thereafter, each of the plaintiffs filed a petition for appeal in the district court seeking a refund for the payment of the taxes paid under protest and asserting that the Department erroneously determined that the additional franchise tax and interest were due. After the matters were consolidated, the plaintiffs filed a motion for partial summary judgment on the issue of liability. According to the plaintiffs, the Department's audit determination that they had underpaid Louisiana franchise taxes was erroneous, in part, because the auditors' applications and interpretations of the pertinent law and regulations were incorrect. Particularly, they asserted that the auditors misapplied costs and values to taxable income, based on a misunderstanding of the cash management system employed by the Boyd entities. The plaintiffs also generally asserted that in assessing the taxes, the auditors ignored established accounting principles, precedents, and the franchise tax law itself. In response, the Department asserted, and continues to maintain on appeal, that genuine issues of material fact remain that negate the grant of summary judgment and, further, that it correctly applied the law in computing the additional corporate franchise taxes owed by the plaintiffs.

After a hearing, the district court issued written reasons on October 1, 2014, finding that there was no evidence of any disputed issues of material fact and that the central dispute in the case involved the interpretation and application of the law. After consideration of the applicable law, the district court granted the plaintiffs' motion for partial summary judgment. Thereafter, the district court signed a judgment on November 24, 2014, granting a partial summary judgment on the issue of liability in favor of the plaintiffs. The Department appealed.

Subsequently, this court ex proprio motu examined the record and noted a potential jurisdictional defect in the judgment. Following the submission of memoranda and oral argument, we determined that the judgment did not contain sufficient decretal language to constitute a final appealable judgment, declined to convert the invalid appeal to a supervisory writ, dismissed the appeal, and remanded the matter for further

3

proceedings. See **Boyd Louisiana Racing, Inc. v. Bridges**, 15-0393 (La.App. 1 Cir 12/23/15) (unpublished), 2015 WL 9435285.

After this court's decision, the plaintiffs filed a Motion for Entry of Judgment and attached a proposed judgment. The district court signed the proposed judgment on August 9, 2016, prior to the scheduled hearing on the motion, and mailed notice of the judgment to the parties. The judgment granted the motion for partial summary judgment on the issue of liability, as follows:

1. Because all management services were performed in its offices in Nevada rather than in Louisiana, the Department of Revenue erred in its auditor's adjustments with respect to the management fees collected by Boyd Gaming Corporation.

2. Because Boyd Gaming used generally accepted "equity accounting" principles to value its investment in subsidiaries, the adjustments to surplus and undivided profits made by the Department of Revenue's auditor were not proper.

3. The participation of the Taxpayers in the common cash management system used by Boyd Gaming Corporation and all its affiliates, including Boyd Kenner and Boyd Louisiana Racing, was not a borrowing of capital by Boyd Gaming, Boyd Kenner or Boyd Louisiana Racing, so the auditor's adjustments to borrowed capital were incorrect.

4. Partnership tax losses were properly included in Boyd Gaming's volume of business ratio for the Periods at Issue because the regulation prohibiting that inclusion was not in effect during the years 2002-2004.

The judgment also provided that the determination of the amount of refund to which the plaintiffs were entitled would be the subject of future proceedings.

In the meantime, the Department opposed the motion for the entry of judgment. On September 26, 2016, the district court held the hearing on the content of the proposed judgment and took the matter under advisement. Thereafter, the Department filed a suspensive appeal from the district court's August 9, 2016 judgment. The district court signed the order for suspensive appeal on October 12, 2016, but the signature was later scratched through with the following unsigned undated handwritten note: "moot – this is an appeal of a judgment erroneously signed."

On November 2, 2016, the district court issued a Ruling on Plaintiffs' Motion for Entry of Judgment, ordering that the plaintiffs' proposed judgment be filed and tendered to the court for signature. The judgment was signed on November 18, 2016,

and was identical to the August 9, 2016 judgment. Also, as in the August 9, 2016 judgment, the November 18, 2016 judgment ordered that the judgment consituted a final judgment pursuant to LSA-C.C.P. art. 1915B for purposes of an immediate appeal because there was no just reason for delay.[1]

Thereafter, on April 4, 2017, "[i]n an abundance of caution and due to the unique circumstances present," the Department filed another motion for suspensive appeal, seeking to appeal the August 9, 2016 and November 18, 2016 judgments. The Department filed a memorandum in support of the motion for suspensive appeal, and the plaintiffs filed a memorandum in opposition to the motion.

On January 9, 2018, the district court issued its Ruling on Motion for Suspensive Appeal and denied the Department's appeal, stating that "all counsel of record were informed that the earlier judgment was signed prematurely in error and that the motion for suspensive appeal filed in response to the premature judgment would not be signed by the Court and processed." The district court found that the Department's failure to either file a timely new motion for appeal or to request that the original motion for appeal be processed with a new corrected order "resulted in defendant's failure to timely file an appeal as to the Judgment that it was seeking to have overturned." The order denying the motion for suspensive appeal was signed on January 29, 2018. The Department then applied for supervisory writs with this court. On June 4, 2018, this court granted the writ and reversed the district court's denial of the Department's suspensive appeal, with instructions to enter an order of appeal from the August 9, 2016 judgment and the November 18, 2016 judgment. See **Boyd Louisiana Racing, Inc. v. Bridges**, 18-0159 (La.App. 1 Cir. 6/4/18) (unpublished writ action). Thereafter, the district court signed the order of appeal.

Now on appeal, the Department asserts that the district court erred in finding that there were no genuine issues of material fact and that the plaintiffs were not liable

---

[1] Although the district court designated the judgment as final, the court failed to provide reasons to support this designation. When the propriety of the certification is not apparent and the district court has failed to give reasons for its certification, we review the case *de novo* using the factors set forth in **R.J. Messinger, Inc. v. Rosenblum**, 04-1664 (La. 3/2/05), 894 So.2d 1113, 1122. After a review of the record in light of the **Messinger** factors, we find that the district court did not err in designating the judgment as final, and the district court's certification was appropriate.

for the additional franchise taxes at issue. Particularly, the Department contends that the district court erred in holding that:

1. Management services were performed solely in Nevada, thereby resulting in an improper audit adjustment regarding management fees collected by Boyd Gaming;

2. Audit adjustments to surplus and undivided profits were not proper because the plaintiffs utilized equity accounting principles to value investments in subsidiaries;

3. Treatment of funds maintained by Boyd Gaming in the common cash management system was improperly characterized as borrowed capital on audit; and

4. Partnership tax losses were properly included in Boyd Gaming's volume of business ratio.

## SUMMARY JUDGMENT LAW AND STATUTORY INTERPRETATION

A motion for summary judgment is a procedural device used to avoid a full scale trial when there is no genuine issue of material fact. **GameStop, Inc. v. St. Mary Parish Sales and Use Tax Dept.**, 14-0878 (La.App. 1 Cir. 3/19/15), 166 So.3d 1090, 1094, writ denied, 15-0783 (La. 6/1/15), 171 So.3d 929. A motion for summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966B(2).[2]

In determining whether summary judgment is appropriate, this court will review the evidence *de novo* using the same criteria governing the district court's determination of whether summary judgment is appropriate. **Thompson v. Center for Pediatric and Adolescent Medicine, L.L.C.**, 17-1088 (La.App. 1 Cir. 3/15/18), 244 So.3d 441, 444, writ denied, 18-0583 (La. 6/1/18), 243 So.3d 1062. When the issue before the court on the motion for summary judgment is one on which the party bringing the motion will bear the burden of proof at trial, the burden of showing there is no genuine issue of material fact remains with the party bringing the motion. **Green v. Johnson**, 16-1525 (La.App. 1 Cir. 1/10/18), 241 So.3d 1188, 1191.

---

[2] Louisiana Code of Civil Procedure Article 966 was amended and reenacted by La. Acts 2015, No. 422 § 1, eff. January 1, 2016. Therefore, we refer to the former version of the article in this opinion.

A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the legal outcome of the dispute. A genuine issue is one as to which reasonable persons could disagree. If reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. **Thompson**, 244 So.3d at 445.

The interpretation of a statute is a question of law that may be decided by summary judgment. When addressing legal issues, the appellate court gives no special weight to the findings of the district court, but exercises its constitutional duty to review questions of law *de novo*, after which it renders judgment on the record. **Bannister Properties, Inc. v. State**, 18-0030 (La.App. 1 Cir. 11/2/18), 265 So.3d 778, 788, writ denied, 19-0025 (La. 3/6/19), 266 So.3d 902.

Moreover, taxing statutes are to be interpreted liberally in favor of the taxpayer and against the taxing authority. If the statute can reasonably be interpreted more than one way, the interpretation less onerous to the taxpayer is to be adopted. **Entergy Louisiana, Inc. v. Kennedy**, 03-0166 (La.App. 1 Cir. 7/2/03), 859 So.2d 74, 77-78, writ denied, 03-2201 (La. 11/14/03), 858 So.2d 430. Furthermore, words defining a thing to be taxed should not be extended beyond their clear import. **Cleco Evangeline, LLC v. Louisiana Tax Com'n**, 01-2162 (La. 4/3/02), 813 So.2d 351, 355. Absent evidence to the contrary, the language of the statute itself must clearly and unambiguously express the intent to apply to the property in question. **Id**.

## DISCUSSION

Article VII, § 1 of the Louisiana Constitution vests the power of taxation in the legislature. Pursuant to LSA-R.S. 47:601A, the Louisiana corporate franchise tax is imposed on "[e]very domestic corporation and every foreign corporation, exercising its charter, or qualified to do business or actually doing business in this state, or owning or using any part or all of its capital, plant, or any other property in this state." LSA-R.S. 47:601.[3] Taxable capital is defined for purposes of corporate franchise tax in LSA-R.S. 47:602A, which, during the audit period, provided:

---

[3] Louisiana Revised Statutes 47:601 provided during the relevant period, in part:

**Taxable capital.** Every corporation taxed under this Chapter shall determine the amount of its issued and outstanding capital stock, surplus, undivided profits and borrowed capital as the basis for computing the franchise tax levied under this Chapter and determining the extent of the use of its franchise in this state.

Further, Article VII, § 3(A) of the Louisiana Constitution mandates the legislature to "provide a complete and adequate remedy for the prompt recovery of an illegal tax paid by a taxpayer." To fulfill its obligation, the legislature has provided three remedies to taxpayers: 1) the Claims Against the State procedure, LSA-R.S. 47:1481-1486; 2) the Payment Under Protest procedure, LSA-R.S. 47:1576; and, 3) the Overpayment Refund procedure, LSA-R.S. 47:1621-1627. **St. Martin v. State**, 09-0935 (La. 12/1/09), 25 So.3d 736, 738; **Bannister**, 265 So.3d at 788. Relevant to our analysis is the Payment Under Protest procedure.

---

A. Every domestic corporation and every foreign corporation, exercising its charter, or qualified to do business or actually doing business in this state, or owning or using any part or all of its capital, plant, or any other property in this state, subject to compliance with all other provisions of law, except as otherwise provided for in this Chapter shall pay an annual tax at the rate of $3.00 for each $1,000.00, or major fraction thereof on the amount of its capital stock, surplus, undivided profits, and borrowed capital, determined as hereinafter provided; the minimum tax shall not be less than $10.00 per year in any case. The tax levied herein is due and payable on any one or all of the following alternative incidents:

(1) The qualification to carry on or do business in this state or the actual doing of business within this state in a corporate form. The term "doing business" as used herein shall mean and include each and every act, power, right, privilege, or immunity exercised or enjoyed in this state, as an incident to or by virtue of the powers and privileges acquired by the nature of such organizations, as well as, the buying, selling, or procuring of services or property.

(2) The exercising of a corporation's charter or the continuance of its charter within this state.

(3) The owning or using any part or all of its capital, plant, or other property in this state in a corporate capacity.

B. It is the purpose of this Section to require the payment of this tax to the state of Louisiana by domestic corporations for the right granted by the laws of this state to exist as such an organization, and by both domestic and foreign corporations for the enjoyment, under the protection of the laws of this state, of the powers, rights, privileges, and immunities derived by reason of the corporate form of existence and operation. The tax hereby imposed shall be in addition to all other taxes levied by any other statute.

C. (1) As used herein the term "domestic corporation" shall mean and include all corporations, joint stock companies or associations, or other business organizations organized under the laws of this state which have privileges, powers, rights, or immunities not possessed by individuals or partnerships.

(2) The term "foreign corporation" shall mean and include all such business organizations as hereinbefore described in this Paragraph which are organized under the laws of any other state, territory or district, or foreign country.

During the tax years at issue, the Payment Under Protest procedure provided that if a taxpayer protested the payment of any tax or enforcement of any tax law, the taxpayer had to pay the amount due and at that time give notice of intention to file suit for recovery of the tax. The amount paid was then placed in escrow for thirty days. If suit was filed within that period, the funds would be further held pending outcome of the suit.[4] **Church Point Wholesale Beverage Co., Inc. v. Tarver**, 614 So.2d 697, 703-04 (La. 1993). Following the audits, and in accordance with LSA-R.S. 47:1576, the plaintiffs remitted the additional franchise taxes at issue, advised the Department that the taxes were paid under protest, and timely filed a petition for appeal from the decision of the Department for the franchise taxes paid under protest and for statutory interest thereon.

In its assignments of error on appeal, the Department has identified four disputed audit adjustments. We will address each one separately.

Management fees

The Department first asserts that Boyd Gaming mischaracterized management fees received from Boyd Kenner and Boyd Louisiana Racing. The Department acknowledged that it allowed the plaintiffs to exclude support fees from the numerator of the franchise tax computation, taking the position that such fees constituted a reimbursement for expenses, or recovery costs, paid on behalf of a subsidiary. However, with regard to management fees, the Department maintains that such fees were not "net sales made to customers," as asserted by the plaintiffs, or reimbursements of expenses. The Department contends that the fees were actually revenues transferred between a parent company and its subsidiaries, which must be included in the volume of business ratio of Boyd Gaming under LSA-R.S. 47:606A(1)(k) and 606B.

Therefore, we first consider LSA-R.S. 47:606, regarding the allocation of taxable capital, which provided, in relevant part:

**A. General allocation formula.**

---

[4] If suit was not timely filed, courts have held the taxpayer no longer had a right to proceed in district court for the recovery of taxes. **Church Point Wholesale Beverage Co., Inc. v. Tarver**, 614 So.2d 697, 704 (La. 1993).

For the purpose of ascertaining the tax imposed in this Chapter, every corporation subject to the tax is deemed to have employed in this state the proportion of its entire issued and outstanding capital stock, surplus, undivided profits, and borrowed capital, computed on the basis of the ratio obtained by taking the arithmetical average of the following ratios:

(1) The ratio that the net sales made to customers in the regular course of business and other revenue attributable to Louisiana bears to the total net sales made to customers in the regular course of business and other revenue. For the purposes of this Subsection net sales and other revenues attributable to Louisiana shall be determined as follows:

\* \* \*

(f) Revenues from services other than those described above shall be attributed within and without Louisiana on the basis of the location at which the services are rendered.

\* \* \*

(k) Revenues from a parent or subsidiary corporation shall be allocated as provided in Subsection B of this Section.

(2) The ratio that the value of all of the taxpayer's property and assets situated or used in Louisiana bears to the value of all of its property and assets wherever situated or used. In determining value, depreciation and depletion reserves must be deducted from the book values of the properties in question.

\* \* \*

**B. Allocation of intercompany items.** For the purpose of allocation, investments in, advances to, or revenues from a parent or subsidiary corporation shall be allocated to Louisiana on the basis of the percentage of capital employed in Louisiana for corporation franchise tax purposes by the parent or subsidiary corporation.

Thus, according to LSA-R.S. 47:606A, the ratios obtained are averaged and the resulting percentage applied to the taxable capital to determine the amount thereof employed in Louisiana. **Kansas City Southern Ry. Co. v. Reily**, 242 La. 235, 241, 135 So.2d 915, 917 (1961).

In interpreting LSA-R.S. 47:606, the plaintiffs argue that the management fees collected by Boyd Gaming during the audit period were revenue under the terms of the management agreements signed by the subsidiaries, produced by the sales of services. Therefore, according to the plaintiffs, Boyd Gaming included all of the management fees it received from its subsidiaries in its total revenue number, the denominator of the ratio of volume of business portion of its franchise tax calculation. However, with regard to the numerator, the plaintiffs contend that because the management services

10

were performed in Nevada, and not Louisiana, Boyd Gaming properly excluded the management fees collected from its Louisiana affiliates in the numerator of its volume of business ratio.[5] Therefore, the plaintiffs assert that the auditor for the Department incorrectly added the management fees paid by the subsidiaries to the numerator of the business volume ratio. Additionally, the plaintiffs argue that the Department failed to apply the version of LSA-R.S. 47:606A in effect for the audit period.[6]

While the plaintiffs and the Department both agree that LSA-R.S. 47:606B governs the allocation of intercompany items, they disagree as to its interpretation. The Department contends that LSA-R.S. 47:606B is controlling, whereas the plaintiffs maintain that LSA-R.S. 47:606B and its regulation directed them back to LSA-R.S. 47:606A. Thus, we look to the accompanying regulation to LSA-R.S. 47:606B to assist us in ascertaining the statute's proper interpretation.

Pursuant to its authority to make rules,[7] the Department promulgated Rule 606B, which provided, in relevant part:

> Without regard to the legal or commercial domicile of a corporation subject to the tax imposed by this Chapter, and without regard to the business situs of investments in or advances to a subsidiary or parent corporation by a corporation subject to the tax imposed by this Chapter, all such investments in, advances to, and **revenue from such parent or subsidiary shall be allocated to Louisiana on the basis of the percentage of capital employed in Louisiana by the parent or subsidiary corporation for franchise tax purposes. The corporation franchise tax ratio of the parent or subsidiary shall be the measure of the extent to which the investment in, advances to, and revenues from the parent or subsidiary are attributable to Louisiana** for purposes of determining the revenue and property ratios to be used in allocating the total taxable base of any corporation subject to the tax imposed by this Chapter to Louisiana.
>
> * * *
>
> For purposes of this subsection, accounts receivable which may be considered to be advances resulting from normal trading between the companies in the regular course of business and the sales of merchandise,

---

[5] Although the plaintiffs contend that the Department's auditor incorrectly characterized support fees as "pure recovery costs", rather than "revenues", and erroneously removed those fees from the denominator of Boyd Gaming's business volume ratio, we note that they neither appealed nor answered the appeal on this issue, and the issue of support fees is therefore not before us.

[6] Given our analysis and holding herein, we need not address the argument of the plaintiffs as to this issue.

[7] We note that La. Acts 2003, No. 39 § 1, eff. May 23, 2003, revised the rule-making authority of the secretary of the Department, found in LSA-R.S. 47:1511, to require compliance with the Administrative Procedure Act. The revision also reiterated that the rules and regulations promulgated would have the full force and effect of law.

products, or services in such transactions shall not be included in advances to or revenue from a parent or subsidiary under this provision, but shall be allocated and attributed as provided in R.S. 47:606A and the regulations issued thereunder.

(Emphasis added).

The plaintiffs contend that Boyd Gaming received management fees from the sales of services in the regular course of business between the companies and, therefore, such revenue was not to be included in revenue from a parent or subsidiary under this regulation, but rather was allocated as provided in LSA-R.S. 47:606A. As directed by the last paragraph of the regulation to LSA-R.S. 47:606B, the plaintiffs submit that they properly looked to Rule 606A(1)(e), which provided:

> (1) Net sales and other revenue
>
> * * *
>
> (e) Revenue from services other than from transportation
>
> Revenue derived from services other than from transportation shall be attributed to the state in which the services are rendered. In the case of services in which property is not a material revenue-producing factor, the services shall be presumed to have been performed in the state in which the personnel engaged in rendering the services are located.[8]

However, the plaintiffs' reliance on this subsection of the regulation is misplaced. Also part of the regulation to LSA-R.S. 47:606A is subsection (j), the more specific regulation regarding revenue from a parent or subsidiary corporation, which referred the taxpayer back to LSA-R.S. 47:606B. Subsection (j) provided:

> (j) Revenue from a parent or subsidiary corporation
>
> Revenue from a parent or subsidiary corporation shall be allocated as provided in R.S. 47:606B and the regulations issued thereunder.

Accordingly, we find LSA-R.S. 47:606B and the regulations promulgated thereunder applicable to the issue before us.[9]

---

[8] Subsection (e) also provided:

> In any case in which it can be shown that charges for services constitute a pure recovery of the cost of performing the services and do not include a reasonable rate of profit, amounts received in reimbursement of such costs shall not be construed to be revenues received and shall be omitted from both the numerator and denominator of the attribution ratio.

[9] We note that it is well-settled that when two statutes apply to the same situation, the specific prevails over the general. **Silver Dollar Liquor, Inc. v. Red River Parish Police Jury**, 10-2776 (La. 9/7/11), 74 So.3d 641, 648; **Burge v. State**, 10-2229 (La. 2/11/11), 54 So.3d 1110, 1113.

In light of the above, we now review the evidence submitted in support of and in opposition to the motion for partial summary judgment as to the issue of management fees. In support of their motion, the plaintiffs presented the affidavit of David Krasn, the vice-president of corporate tax at Boyd Gaming, wherein he attested that Boyd Gaming collected management fees and support fees as revenue from its subsidiaries under the terms of the management agreements. Further, he stated that the fees were basically revenue from normal trading between Boyd Gaming and its subsidiaries that were produced by the sales of services to the subsidiaries. Pursuant to the management agreement, management services included supervision and direction in the management of the local project, establishing and maintaining internal controls, promotion and sales programs, comprehensive marketing efforts, as well as other services. The fee for such management services was a percentage of the affiliate's EBITDA (earnings before interest, taxes, depreciation, and amortization) calculated on an annual basis.

Mr. Krasn also stated that in its franchise tax return, Boyd Gaming included all of the management fees collected in its total revenue number, being the denominator of the ratio of volume of business portion of its franchise tax calculation. According to Mr. Krasn, because the management services provided by Boyd Gaming were performed in Nevada and not Louisiana, Boyd Gaming did not include the management fees collected from its Louisiana affiliates in the numerator of the ratio of volume of business.

However, in opposition to the motion for summary judgment, the Department has asserted that the district court erred in determining that the management services were all performed in Nevada. The Department offered the deposition of Mr. Krasn, who testified that on occasion Boyd Gaming employees would perform services in Louisiana for the subsidiary.

A review of Mr. Krasn's deposition shows that the primary sources of operating capital for Boyd Gaming was the revenue generated from management and support fees. When Mr. Krasn was asked if Boyd Gaming employees in Nevada ever come to Louisiana, the following discussion took place:

A. On occasion, they may come to Louisiana; but the management agreement specifically states that to the extent a Boyd Gaming employee is performing services outside of Nevada, [the employee is] performing those services as an employee of the subsidiary. There's a common paymaster rule.

Q. So they would actually bill their time and get paid by - - get a salary check from the subsidiary?

A. That's not required under the common paymaster rule.

Q. Tell me what the common paymaster rule is.

A. It's just when you have subsidiaries you are not required to cut a separate check. That you can have those employees work for that entity and still pay them out of the same entity that you normally do.

Q. Is it your position that because of the common paymaster rule that person would not actually be providing services here in Louisiana?

A. I'm saying that person is not providing services as an employee of Boyd Gaming. [The employee is] providing those services as an employee of Boyd Kenner or Boyd Racing.

Considering the above and our *de novo* review of the record, we conclude that the evidence presented has sufficiently created a genuine issue of material fact. Although Boyd Gaming claims that the language in the management agreements provided that Boyd Gaming employees in Louisiana were not performing services for Boyd Gaming, but rather for the subsidiary, nevertheless, under the common paymaster rule, the employees providing services in Louisiana were paid by Boyd Gaming. Therefore, to the extent that Boyd Gaming utilized employees in Louisiana, and continued to pay those employees, we find there exists a genuine issue of material fact as to whether said employees were employed by the subsidiary or by Boyd Gaming while rendering services in Louisiana. Accordingly, we find that the district court erred in granting summary judgment as to this issue.

Surplus and undivided profits

The Department next argues that the district court erred in concluding that the audit adjustments to surplus and undivided profits were not proper because the plaintiffs utilized equity accounting principles to value investments in its unincorporated affiliates, Treasure Chest, LLC and Boyd Racing, LLC. In particular, the Department states that the plaintiffs adjusted the book values of various investments below original acquisition costs to take advantage of losses suffered by the investments. It then

14

asserts that its regulations specifically forbid any such reduction below investment cost except where the taxpayer can support the reduction with a bona fide valuation based on the investment's fair market value. The Department alleges that it is undisputed that the plaintiffs did not obtain the required bona fide valuations to substantiate the reduced book values for the investments. Therefore, according to the Department, it correctly reversed the plaintiffs' decreasing adjustments and used original investment acquisition cost in its computation of the plaintiffs' corporate franchise tax.

In order to resolve this issue, we must interpret the meaning of the term "surplus and undivided profits" found in LSA-R.S. 47:605. During the audit period, LSA-R.S. 47:605A provided, in part:

> **A. Determination of value.** For the purpose of ascertaining the tax imposed in this Chapter, surplus and undivided profits shall be deemed to have such value **as is reflected on the books of the corporation**, subject to examination and revision by the collector from the information contained in the report filed by the corporation as hereinafter provided and from any other information obtained by the collector; but in no event shall such revision reflect the value of any asset in excess of the cost thereof to the taxpayer at the time of acquisition; ... provided that in no event shall such value be less than is shown on the books of the taxpaying corporation.

(Emphasis added). Additionally, the regulation to LSA-R.S. 47:605, provided, in part:

> A. Determination of value
>
> For the purpose of determining the tax imposed by R.S. 47:601, there are statutory limitations on both the maximum and minimum amounts which shall be included in the taxable base with respect to surplus and undivided profits. The minimum amount which shall be included in the taxable base shall be no less than the amount reflected on the books of the taxpayer. Irrespective of the reason for any book entry which increases the franchise tax base, such as, but not limited to, entries to record asset appreciation, entries to reflect equity accounting for investments in affiliates or subsidiaries, and amounts credited to surplus to record accrual of anticipated future tax refunds created by accounting timing differences, the amount reflected on the books must be included in the tax base.
>
> Entries to the books of any corporation to record the decrease in value of any investment through the use of equity accounting will be allowed as a reduction in taxable surplus and its related asset account for property factor purposes. This is only in those cases in which all investments are recorded under the principles of equity accounting, and such reductions in the value of any particular investment below cost thereof to the taxpayer will not be allowed. **The exception is in those instances in which the taxpayer can show that such reduction is in the nature of a bona fide valuation adjustment based on the fair value of the investment.** In no case will a reduction below zero

15

value be recognized. Corresponding adjustments shall in all instances be made to the value of assets for property factor purposes.

(Emphasis added).

In support of their motion for summary judgment, the plaintiffs referred to Mr. Krasn's affidavit, wherein he attested that all three Boyd entities utilized a common accounting system during the audit period employing "Equity Accounting" principles to determine the value of their investments in affiliates for all purposes, including franchise tax. He further stated that equity accounting determines the recorded value of an investment by recording the initial cost of the investment and then adjusting the amount annually by the investor's share of net profit or loss, subsequent capital contributions, and distributions. He attested that "cost" under equity accounting principles is a fluid figure that reflects additions and subtractions to the recorded value over time. Additionally, Mr. Krasn stated that in the three tax years at issue, each of the plaintiffs reported losses to several of their investments, which resulted in the reduction of the "cost" of each investment with losses below its initial acquisition cost on their books. Mr. Krasn explained that the Department's auditor revised the numerical value of each investment to its original acquisition cost and additional contributions, which was a number in excess of the cost shown on the plaintiffs' books.

The plaintiffs argue that the Department's interpretation of "cost" arbitrarily imputed value that no longer exists and resulted in the taxation of phantom capital. They also contend that the Department presented no summary judgment evidence contradicting the determination of the value of the plaintiffs' investments using the equity method of accounting.

On our *de novo* review, we find that the evidence sufficiently established that the adjustments made pursuant to the equity method of accounting reflect the fair value of the investment. Pursuant to LSA-R.S. 47:605A, surplus and undivided profits were deemed to have such value as was reflected on the books of the corporation.[10] Further, the regulation permitted the adjustments based on the fair value of the investment. See **McNamara v. Arkansas-Louisiana Gas Co.**, 441 So.2d 446, 449

---

[10] We note that this was subject to examination and revision by the collector. See LSA-R.S. 47:605A.

16

(La.App. 2 Cir. 1983). Moreover, the Department failed to present any evidence contradicting the plaintiffs' determination of the value of their investments utilizing the equity method of accounting. Accordingly, we find no error by the district court in granting summary judgment on this issue, finding that the audit adjustments to surplus and undivided profits were not proper because the plaintiffs utilized equity accounting principles to value investments in subsidiaries.

Borrowed capital

The Department next assigns as error the district court's determination that funds maintained by Boyd Gaming in the common cash management system were improperly characterized by the Department as borrowed capital.[11] The Department contends that the funds furnished by the affiliates to Boyd Gaming were used to carry on Boyd Gaming's own business. Therefore, according to the Department, the funds constitute borrowed capital and, as such, were properly added for purposes of computing franchise tax.

The term "borrowed capital" was defined in LSA-R.S. 47:603, which provided, in part:

> A. As used in this Chapter, "borrowed capital" means all indebtedness of a corporation, subject to the provisions of this Chapter, maturing more than one year from the date incurred, or which is not paid within one year from the date incurred regardless of maturity date. ... With respect to amounts owed by a taxpayer corporation to an affiliate, all real and actual indebtedness, regardless of age, and which in fact represent capital substantially used to finance or carry on the taxpayer's business, shall be borrowed capital.
>
> * * *
>
> B. The following indebtedness shall be excluded:
>
> * * *
>
> (2) Advances, credits, or sums of money voluntarily left on deposit with the taxpayer, or for credit account by customers or other persons with merchants, agents, brokers, or factors, to facilitate the transaction of business between such parties, and by such taxpayer segregated and not otherwise used in the conduct of its business.

---

[11] In 2004, the legislature began the phase-out of borrowed capital as being included in taxable capital for computing franchise tax, and LSA-R.S. 47:603 was repealed by La. Acts 2008, 2nd Ex.Sess., No. 10, § 3, eff. Jan. 1, 2011.

The Department contends that LSA-R.S. 47:603A dictates that the funds advanced from the Louisiana subsidiaries to Boyd Gaming created a "real and actual indebtedness" between the entities. Therefore, it reclassified funds held by Boyd Gaming as borrowed capital for purposes of computing franchise tax. The Department argues that the funds held in Boyd Gaming's concentrator account were subject to the complete control of Boyd Gaming and that the subsidiaries could not access said funds. Further, it alleges that the funds were not in any way actually segregated or earmarked as belonging to the subsidiary of origin.

In order to determine if the transfer of funds between Boyd Gaming and its Louisiana affiliates constituted a "real and actual indebtedness," we look to the regulation regarding borrowed capital, found in Rule 603, which provided, in part:

A. General

As used in this Chapter, "borrowed capital" means all indebtedness of a corporation, subject to the provisions of this Chapter, maturing more than one year from the date incurred, or which is not paid within one year from the date incurred regardless of maturity date.

All indebtedness of a corporation is construed to be capital employed by the corporation in the conduct of its business or pursuit of the purpose for which it was organized, and in the absence of a specific exclusion, qualification, or limitation contained in the statute, must be included in the total taxable base. No amount of indebtedness of a corporation may be excluded from borrowed capital except in those cases in which the corporation can demonstrate conclusively that a specific statutory provision permits exclusion of the indebtedness from borrowed capital.

\* \* \*

In the case of amounts owed by a corporation to a creditor who meets the definition of an "affiliated corporation" contained in R.S. 47:603, the age or maturity date of the indebtedness is immaterial. An affiliated corporation is defined to be any corporation which through (a) stock ownership, (b) directorate control, or (c) any other means, substantially influences policy of some other corporation or is influenced through the same channels by some other corporation. It is not necessary that control exist between the corporations but only that policy be influenced substantially. Any indebtedness between such corporations constitutes borrowed capital to the extent it represents capital substantially used to finance or carry on the business of the debtor corporation, regardless of the age of the indebtedness. For this purpose, all funds, materials, products, or services furnished to a corporation for which indebtedness is incurred, except as provided in this subpart with respect to normal trading accounts and offsetting indebtedness, are construed to be used by the corporation to finance or carry on the business of the corporation; in the absence of a conclusive showing by the

18

taxpayer to the contrary, all such indebtedness shall be included in borrowed capital.

* * *

B. Exclusions from Borrowed Capital

* * *

(2) Voluntary deposits

The liability of a taxpayer to a depositor created as the result of advances, credits, or sums of money having been voluntarily left on deposit shall not constitute borrowed capital if:

(a) said moneys have been voluntarily left on deposit to facilitate the transaction of business between the parties, and

(b) said moneys have been segregated by the taxpayer and are not otherwise used in the conduct of its business.

The Department argues that the regulation shows that actual indebtedness is created when funds are advanced to a taxpayer from an affiliated corporation and that these advanced funds are deemed to be used to carry on the taxpayer's business unless the taxpayer can conclusively prove otherwise. Further, it asserts that such indebtedness "shall be borrowed capital" under LSA-R.S. 47:603A. The plaintiffs contend, however, that the funds were held on deposit by Boyd Gaming, were not "borrowed" by Boyd Gaming, and were not "real and actual indebtedness." Additionally, they argue that the funds were segregated in the ledger account and were not used in the conduct of Boyd Gaming's business.

The evidence presented in support of and in opposition to the motion for partial summary judgment established that, during the audit period, the Boyd entities used a common accounting system and a common health benefits plan. As part of its own operations, Boyd Gaming, the corporate parent, provided certain centralized administrative services for itself and all affiliates, which included maintaining consolidated books and records and administering the benefits plan. Individual operating entities, however, were the primary administrators of local operations, and each entity maintained its own property-specific set of books.

The evidence further established that various operating entities, including Boyd Kenner and Boyd Louisiana Racing in Louisiana, generated cash daily from operations.

19

Once expenses were paid, if cash remained in the local operating entity's bank account, the excess cash was "swept" daily into a central concentrator account and held for the benefit of the operating entity, such as Boyd Kenner or Boyd Louisiana Racing.

Boyd Gaming's books included a ledger account labeled "due to/from affiliate" or "DTFA" in which payments were recorded as either "due to" or "due from" an affiliate. When sufficient swept funds were recorded in the DTFA as "due to" an affiliate, amounts "due from" that affiliate were simultaneously "paid" to Boyd Gaming and accounted for in Boyd Gaming's operations. The net amount in the DTFA account was always held "on account" for the use of the affiliates.

Both Mr. Krasn and Bryan Wilson, the cash manager at Boyd Gaming, stated in their affidavits that the excess funds were managed by Boyd Gaming and were held on deposit for the affiliates. They also attested that the funds were not used in Boyd Gaming's business. Mr. Krasn specifically stated that "Boyd Gaming does not use cash swept from its affiliates to finance or carry on its business." Mr. Wilson also stated that the funds that were swept "were not used in Boyd Gaming's business; they were held on deposit for the affiliates."

We begin our *de novo* review pointing out that any indebtedness of Boyd Gaming is construed to be used by the corporation to finance or carry on its business and shall be included in borrowed capital, absent a conclusive showing by the taxpayer to the contrary. See Rule 603. We find that the plaintiffs failed to present sufficient evidence to establish that the funds swept by Boyd Gaming were not an "indebtedness" and the auditor erred in finding that the funds were borrowed capital. Although the plaintiffs presented evidence that the funds "due to" the Louisiana subsidiaries were not used in the conduct of Boyd Gaming's business, we note that no evidence was presented of any restrictions or limitations on Boyd Gaming's use of the funds in the concentrator account. Further, the record establishes that Boyd Gaming had exclusive control of the concentrator account. Accordingly, we find that Boyd Gaming failed to conclusively establish that the funds were not substantially used to carry on its business.

20

Additionally, Boyd Gaming failed to establish that these funds fell within an exclusion from borrowed capital as set forth in LSA-R.S. 47:603B(2). There was no evidence that the moneys were "segregated by the taxpayer" as required by this statute. The definition of "segregate" in Black's Law Dictionary (11th ed. 2019) is "[t]o separate or make distinct from others or from a general aggregate; to isolate" and "[t]o cause or require separation from others."[12] The statute clearly required segregation, and we find that a ledger account labeled "DTFA" failed to adequately satisfy that requirement. Undoubtedly, the legislature envisioned something more than just an account entry, such as a separate bank account, as asserted by the Department.

Based on the evidence presented, we do not find that Boyd Gaming conclusively established that the funds were not borrowed capital, nor do we find that they were excluded from borrowed capital as a "voluntary deposit." Accordingly, we find that the district court erred in finding that the funds swept by Boyd Gaming were improperly characterized as borrowed capital following the audit and in granting summary judgment as to this issue.

Partnership losses

In its last assignment of error, the Department contends that the district court erred in concluding that Boyd Gaming could include losses suffered by Boyd Louisiana Partnership for franchise tax purposes. Boyd Gaming is the sole owner of Boyd Louisiana Partnership. The Department argues that the inclusion of Boyd Louisiana Partnership's losses in computing an entity's activity in Louisiana results in a distorted volume of business ratio and thus an inaccurate computation of franchise tax. The Department further states that allowing recognition of such a loss gives the appearance that a company had less activity in Louisiana when in fact the opposite may be true. It also asserts that it has been the Department's long-standing policy not to construe partnership losses as revenue of a parent corporation, and there is simply no basis anywhere in LSA-R.S. 47:606 to treat a loss by a subsidiary as revenue of a parent corporation.

---

[12] See also Merriam-Webster Dictionary (online) ("segregate" is "to separate or set apart from others or from the general mass").

21

Therefore, the issue before us now is how partnership losses should have been allocated during the audit period for purposes of corporate franchise tax computation. Applicable to this issue is LSA-R.S. 47:606A(1)(k), which provides:

> All other revenues shall be attributed within and without this state on the basis of such ratio or ratios, prescribed by the collector, as may be reasonably applicable to the type of revenues and business involved.

The Department's corresponding regulation to this subsection provided, in pertinent part:

> For purposes of this chapter, revenues from partnerships shall be attributed within and without Louisiana based on the percentage of the partnership's capital employed in Louisiana, determined by the arithmetical average of the following two ratios:
> [1] The ratio that the partnership's net sales and other revenue in Louisiana bear to the partnership's total net sales and other revenue everywhere as described in R.S. 47:606A(1) and subparts thereunder; and
> [2] The ratio that the partnership's Louisiana property bears to the partnership total property everywhere as described in R.S. 47:606A(2) and subparts thereunder.

The plaintiffs maintain that, during the audit period, losses from partnerships fell within "all other revenues" and were attributed based on the percentage of the partnership's capital employed in Louisiana, determined by the arithmetical average of the two ratios set forth in the regulation. According to the plaintiffs, as per the regulation, "net sales and other revenue" took expenses into account, and, given that the regulation did not specifically mention losses, they included net losses from partnerships in its volume of business ratio. The plaintiffs assert that the Department's auditor arbitrarily changed the allocation of the partnership tax loss for Boyd Louisiana Partnership, as shown in the partnership's tax returns, to the book value of the partnership because it resulted in a higher tax. The plaintiffs also contend that the Department relied on the current provision of the regulation on allocation of partnership revenue and not on the regulation in effect during the audit period. They assert that the regulation in effect at the applicable time did not include the current language that "losses from a partnership are not revenue from a partnership" and that the auditor incorrectly relied on the 2006 substantive amendment to the regulation.

The Department submitted the affidavit of Jay Frost, a review auditor with the Department, who attested that it has been the Department's long-standing policy and

22

construction of pertinent statutes to disallow inclusion of partnership losses in the business volume ratio used to compute franchise tax. He also stated that the policy was formally pronounced in a 2006 revision to the Louisiana Administrative Code.

On our review of the record, we find that the plaintiffs failed to present evidence to sufficiently establish that Boyd Louisiana Partnership's losses during the audit period were "revenues from a partnership" pursuant to LSA-R.S. 47:606A and its applicable regulation. Moreover, the Department presented evidence to the contrary. Therefore, given that the plaintiffs, as the moving party, failed to show that there was no genuine issue of material fact regarding partnership losses, we find that the district court erred in granting summary judgment as to this issue.

## CONCLUSION

For the above reasons, we affirm the August 9, 2016 and November 18, 2016 judgments in part and reverse in part. We affirm the summary judgments insofar as they find no genuine issue of material fact as to the audit adjustments regarding surplus and undivided profits. With regard to the management fees, borrowed capital, and partnership losses, we reverse the judgments of the district court and remand for further proceedings consistent with the views expressed in this opinion. Costs of this appeal in the amount of $4,710.00 shall be assessed one-half to the State of Louisiana, Department of Revenue and Taxation, and one-half to Boyd Gaming Corporation, Boyd Kenner, Inc., and Boyd Louisiana Racing, Inc.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

23

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2018 CA 1309

BOYD LOUISIANA RACING, INC.
VERSUS
CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION,
STATE OF LOUISIANA

Consolidated With

2018 CA 1310

BOYD GAMING CORPORATION
VERSUS
CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION,
STATE OF LOUISIANA

Consolidated With

2018 CA 1311

BOYD KENNER, INC.
VERSUS
CYNTHIA BRIDGES, SECRETARY, DEPARTMENT OF REVENUE & TAXATION,
STATE OF LOUISIANA

Whipple, C.J. dissenting in part.

I agree with the majority in all respects, except one: I disagree with the

majority's decision to affirm the portion of the district court's summary judgment,

which reversed the Department's audit determinations based on the district court

finding that the Department improperly determined the value of the investments and

made improper adjustments, (and thereby erred in determining the surplus profits

and revaluing or adjusting the sums to the acquisition costs). In my view, reading

the statutes at issue together, the Department was properly within its rights in setting

aside the taxpayers' "adjustments." The relevant portion of LSA-R.S.47:605A

provides that "in no event shall such value be **less** than is shown on the books of the

taxpaying corporation." Thus, the statutory scheme recognizes that the value for tax

purposes can be adjusted to reflect **greater** value by the collector from any

information obtained by the collector. Further, while a decrease in value is allowed

under certain circumstances as recognized by the majority, pursuant to LSA-R.S. 47:605, such exception applies only in those instances in which the **taxpayer** can show its reduction is a bona fide valuation adjustment based on the fair market value of the investment, which the taxpayer failed to show. Thus, I would render judgment in favor of the Department on this issue. For these reasons, I respectfully dissent in part.